■ HERBERT L. BRICKMAN, Respondent, v F. W. WOOLWORTH COMPANY, Appellant.—Judgment, Supreme Court, New York County, entered January 13, 1978, finding defendant liable for damages in the amount of $2,484,108.80 is reversed, on the law, vacated, and the case remanded, without costs or disbursements, for a hearing on the question of damages only. While this court affirms the liability aspect of this action, we find that damages were incorrectly assessed. The hearing will confine itself to plaintiff's out-of-pocket expenses and reasonable value of his services, less the value of the land at date of breach of contract. Concur—Evans, Markewich and Yesawich, JJ.

Murphy, P. J., dissents in a memorandum as follows: Plaintiff Brickman, an attorney, was engaged in the business of owning, building and operating shopping centers. Prior to 1973, defendant Woolworth had entered into two leases with the plaintiff. Under those two leases, plaintiff agreed to build shopping centers in return for the defendant's long-term rental of a portion of the premises. In the first week of April, 1973, a representative of the defendant, named Murphy, called Brickman to inquire whether he would be interested in building a third shopping center and Woolco store in Trumbull, Connecticut. The plaintiff responded in the affirmative. On April 3, 1973, Murphy wrote a letter to Brickman to confirm their prior conversation. In the letter, Murphy stated "As agreed the lease will be in the same form as Manchester [lease] and the rent will be at $3.25 per sq. ft." During the ensuing months in 1973, Brickman hired attorneys, architects and engineers to help him complete this project. Many problems had to be overcome before the shopping center could be built. For example, extensive blasting would be necessary; a river passing through the site would have to be re-routed; a zoning change would be necessary. On or about July 31, 1973, a second representative of defendant, named Deery, sent a proposed lease to the plaintiff. Although the plaintiff signed this lease, neither party maintains that this lease ever took effect. Defendant's executive committee never approved that lease but recommended that the lease be renegotiated. On September 12, 1973, the executive committee approved a revised lease. On January 4, 1974, the plaintiff executed the revised lease and forwarded it to the defendant. Article 6 of this lease contained a provision that the defendant would not be required to deliver an executed copy of the lease until the plaintiff had provided satisfactory proof with regard to (1) the title to the premises, (2) zoning changes and (3) subordination agreements. Article 26 contained a merger clause that it was the only agreement between the parties. Section 3 of article 27 contained a cancellation provision. The defendant contends that the lease, as executed by the plaintiff, contained a cancellation date of September 1, 1975. Under section 3, the defendant had the right to cancel before September 1, 1976. If the defendant did not cancel by September 1, 1976, it could not cancel until the fifth anniversary date, January 4, 1979. As will be developed more fully below, the plaintiff denied at trial that he had ever executed a lease containing the September 1, 1975 cancellation date. During the summer and early fall of 1974, the plaintiff eventually satisfied the requirements of article 6 by securing (1) the proper zoning classification, (2) title to the property, and (3) the necessary subordination agreements. On or about November 15, 1974, the defendant executed and returned the January 4, 1974 lease to the

plaintiff. On or about December 20, 1974, Brickman and Deery met and modified the January 4, 1974 lease as previously executed. Brickman, on this same date, also requested that the September 1, 1975 deadline be extended. Deery promised to present that matter to the executive committee. On or about February 14, 1975, plaintiff's architect submitted revised plans on which he intended to build the shopping center. It is not necessary to detail these plans; it is sufficient to observe that the parties disagree as to whether the revised plans differ significantly from the original plans accompanying the January 4, 1974 lease. The executive committee denied the plaintiff's request for an extension on May 2, 1975 on the ground that the revised plans were unacceptable. The plaintiff charges that the real reasons for the denial of the extension request were (1) reports that the site would not be profitable, (2) a drop in defendant's stock, and (3) a general downturn in the economy caused by the oil embargo. Although the complaint originally contained seven causes of action, the plaintiff amended the first cause at trial and discontinued the second and sixth causes. On the remaining causes, the court permitted the plaintiff to conform the pleadings to the proof so as to allege a breach of an oral agreement, as evidenced by Murphy's letter of April 3, 1973. Essentially, the plaintiff asserts that the defendant breached the oral agreement by not affording him a reasonable opportunity to complete a project that presented many difficult construction problems. On the other hand, the defendant maintains that the January 4, 1974 lease is controlling. The defendant emphasizes that it never canceled the lease but that plaintiff has never performed thereunder. The trial court found in plaintiff's favor that "he was unfairly dealt with by defendant". Basically, the court determined that the parties had entered into an oral agreement in April of 1973 with regard to the construction of the Trumbull shopping center. The oral agreement was found not to be barred by the Statute of Frauds (General Obligations Law, § 5-703, subd 2), because (1) it was evidenced by Murphy's letter of April 3, 1973 and (2) plaintiff had partially performed under the oral agreement. Alternatively, the court stated that it would hold the defendant liable on a theory of quasi contract for accepting benefits from the plaintiff. Finally, a finding was made that the January 4, 1974 lease did not contain a September 1, 1975 cancellation date at the time the plaintiff signed it. I agree with the trial court that, on or about April 3, 1973, the parties entered into an oral agreement, that was evidenced by Murphy's letter of April 3, 1973. However, that agreement was not intended to be the final agreement between the parties; it was merely a "binder" agreement for the parties to take those preliminary measures that were necessary to enter into a long-term lease (cf. *Roig v Electrical Research Prods.,* 57 F2d 639). This conclusion is founded upon the fact that the oral agreement, as evidenced by Murphy's letter, did not set forth all the essential terms of this complex construction project. *(Textile Capitol Bldg. Corp. v Wendel Foundation,* 253 App Div 332, 338, affd 279 NY 769.) It is clear from the parties' discussions and negotiations during 1973 that they both recognized the fact that, eventually, it would be necessary to execute a long-term lease similar to those covering the other shopping centers and to the one executed by the plaintiff on January 4, 1974. As the trial court noted, an oral agreement for a 20-year lease is barred by the Statute of Frauds (General Obligations Law, § 5-703, subd 2). Likewise, an oral agreement to execute an agreement that is within the Statute of Frauds is itself within the statute and thus unenforceable (56 NY Jur, Statute of Frauds, § 7, p 24). However, as was stressed by the trial court, the part performance by the plaintiff during 1973 in reliance on that oral agreement removed that

agreement from the strictures of subdivision 2 of section 5-703 of the General Obligations Law. *(McKinley v Hessen,* 202 NY 24.) After the plaintiff executed the January 4, 1974 lease and forwarded it to the defendant, the parties related their actions during the remainder of 1974 to that lease. When the plaintiff had satisfied the covenents in article 6 thereof, the defendant executed and returned that lease to the plaintiff. Article 26 of the lease provides in its entirety: "Art. 26. This lease (including any Short Form lease or Notice of Lease prepared for recording purposes) is and shall be considered to be the only agreement between the parties hereto; all negotiations and oral agreements acceptable to both parties are included herein. The Landlord by the execution hereof acknowledges full performance to the date hereof of all covenants required to be performed by the Tenant under all prior leases, contracts and agreements of every kind and nature whatsoever affecting the demised premises or the property of which the demised premises are a part. The Landlord further releases the Tenant from the performance of any and all obligations of every kind and nature whatsoever under said leases, contracts and agreements (except such obligations as are expressly included in the herein lease), all of which are hereby canceled and terminated." By reason of article 26, the oral agreement of April, 1973 merged in the written lease of January 4, 1974. *(Fogelson v Rackfay Constr. Co.,* 300 NY 334, 340.) Moreover, the plaintiff thus conceded that the defendant had fully performed under the oral agreement. In light of the foregoing, the trial court's reliance upon the oral agreement of April, 1973 was erroneous. With regard to the trial court's determination that the cancellation date was not present in the January 4, 1974 lease at the time the plaintiff executed it, error is presented as a matter of law. After the defendant had executed and returned the lease in November of 1974, the parties amended the lease, as originally executed, in December of 1974. At the time of the amendment, the plaintiff never challenged the validity of the cancellation date. By agreeing to the amendment, the plaintiff thereby ratified the January 4, 1974 lease, including its cancellation provision *(Breger v Hampshire Country Club,* 30 AD2d 526, affd 23 NY2d 958). Therefore, he may not be heard to complain on this appeal that the cancellation date was secretly inserted by the defendant or that it did not provide him with enough time to complete the project. Likewise, in view of the operability of the January 4, 1974 lease, the plaintiff cannot recover on the theory of quasi contract. A passing comment should be made about an interoffice memorandum made by Deery on April 23, 1975. In that memorandum, Deery analyzes the respective contentions of the parties and he explores the various options open to the executive committee. At one point, Deery sets out one future possibility, viz: "In summary, therefore, it appears that our options are limited. Our correspondence files indicate that it was at our instigation and urging that Mr. Brickman acquired the site and undertook the requisite zoning litigation. It is not unreasonable to assume, therefore, that a court may well find a refusal to extend on our part evidence of bad faith which could precipitate a judicial extension and a basis for an assessment of damages". The above-quoted excerpt can in no way be considered an admission of liability by the defendant through its agent; it must be recognized as one individual's opinion as to how a court *might* view the facts in this case. It should be emphasized that in an earlier portion of the memorandum, Deery focuses on the defendant's basic rights in this case: "It is therefore incumbent on us to notify landlord either that we will either extend the outside date for a reasonable time or that we *intend to hold him strictly accountable to the terms of the lease".* (Emphasis supplied.) This last

excerpt shows that Deery realized that the defendant had definitive and vested rights under the January 4, 1974 lease. In view of the binding force of that lease, it is irrelevant why the executive committee chose not to give plaintiff an extension. It was the committee's prerogative not to do so. When plaintiff executed the lease on January 4, 1974, he had 20 months to build the shopping center. Unfortunately, he underestimated the nature and extent of the many difficulties that had to be resolved before construction could commence. Consequently, he did not leave himself sufficient time to meet the September 1, 1975 deadline. Plaintiff must stand ready to absorb the losses, if any, incurred under his ill-conceived bargain with the defendant. Accordingly, I would reverse the judgment of the Supreme Court, New York County, and dismiss the complaint.